Good morning, Your Honors. May it please the Court, Wendy Lasher for the plaintiff, Tanya Guidi. When a doctor tells a patient that a ten-year-old prosthetic device has worn out and that the effect is serious damage to a bone... You're up in Ventura? I am, Your Honor. That's right. We met a long time ago. Yes, Your Honor. Your father was John Cole. That's right. Is that right? That's right. And you had a little baby moving around in the house. He's 24 years old now, Your Honor. Well, you know, when you got up there, I thought maybe you were the baby. I'm ready to send him to law school. All right. So, 24 years, a lot of... Send him to law school and I'll hire him as a clerk if I'm still alive. I promise you that. All right. Yeah. Thank you. So a lot of things can happen in 24 years, but here we're talking about ten years. My client had a hip implant. Ten years later, she started experiencing some pain. She went to the doctor. The doctor told her that her implant had worn out and that the amount of damage to her bone was beyond normal wear and tear. And the only question before the court today is whether, as a matter of law, that much information puts a patient on notice that the product was defective, not that it was merely worn out, but that it was defective. I submit that it does not. Under California tort law, before the statute of limitations and a medical malpractice case begins to run, there must be a suspicion of wrongdoing. And wrongdoing means in a court of the lay understanding of the term wrongdoing. So knowing that something has deteriorated is not knowing that something is wrong with it or that it's defective. And that's all this case is about. If telling a patient that she had serious injury were sufficient to put her on notice. Didn't she know that from the ultrasounds or x-rays or whatever they were, that the hip piece was not only worn out, but that there were fragments around? She did not, Your Honor. The evidence is that she knew that part of the cup, the hip is a ball implanted in a cup, that part of the cup portion was not present on the x-ray. Not present, right. There was no evidence. Not present, it has to be someplace. It was somewhere. There was no evidence that she knew about the particulate debris. That was the defective. I mean, how is worn out and missing different than defective? That's what I'm trying to understand. Well, things wear out over a period of time. And, you know, we're almost confused by hindsight here. But they don't disappear. They don't disappear. Well, they moved somewhere in her body. I don't know if the thing was dissolved or if it was moved. I don't think the record tells us exactly where that went, except that it was loosened. But what we don't know is why that happened. And there is no reason, there's nothing in this record that puts her on notice. And what did she find out after the surgery that she didn't know before? That they could look at the device, that they could see that particulate debris from it attracted, caused bone deterioration. And the device itself was the type of device that would deteriorate in that manner. And the reason it deteriorated was because of the nature of the plastic it was made of. But the only thing I think the record directly shows is no one could examine the implant to see why it had deteriorated until it was removed from her body. Certainly she couldn't. Her doctor did not volunteer that he had or that he could or that he knew this. Did the doctor tell her that there was anything normal about a hip replacement disappearing? I mean, wearing out, quote, wearing out? Here's a phrase, and I think this is a very important difference between our position and Apelli's. The doctor told her, on pages 49 and 50 of the Excerpts of Records, you'll find it, that the damage was beyond normal wear and tear. Now, Apelli has said the doctor told her that what happened was beyond normal wear and tear. I think we read the record differently about that. And I believe the record literally says what the client understood and what she was told was that the damage to her bone was beyond normal wear and tear. At the very least, a reasonable juror could draw and a reasonable person could draw different inferences from that particular evidence. Would she understand that beyond normal wear and tear, damage to her bone resulted from a defective product or simply from deterioration over a period of time? Once the product is removed and it can be inspected, then one can draw lots of conclusions. And what was the time frame? Why did she end up outside the limitations period? Well, I cannot answer the question of why the complaint was filed when it was filed, but California allows a year from discovery. Right. So in other words, if the discovery – did the operation occur within the year from the time she – of the x-rays? The operation occurred within a year from the filing of the complaint. I know. But did it occur within a year from the – from the time that she knew that the – that there was a problem or that the implement had worn out and disappeared? No. I think that she had the x-rays five or six weeks before the surgery, and that's why they said you need to get to a new surgeon and get the surgery done. So what – I'm not trying to say that there's anything about this record that happened that would bring her outside the statute of limitations. So in other words, she could have sued quite easily within one year of the – of the x-rays. There was just five to six weeks between the x-rays and the – and the operation. She could have. But if she had sued – but California allows her a year from discovery. I understand that.  But it isn't true that the operation was more than a year after the x-ray. No, it was a few weeks. But the point is, if we say that discovery happens at the time of the operation, she's allowed that entire year regardless of when she had the x-rays. If the court says that the x-rays put her on notice, there's not much I can do about that. But I don't think that a reasonable person, a reasonable patient, told that something – that an x-ray showed something had worn out or broken or broken off or disappeared in her body, presumably as a result of normal wear and tear because it had worn out, is enough to put someone on notice. And that is the only question in this case. It is a remarkable case in that it's that simple. But unless the Court has further questions, I'd like to save. So you – your firm was not involved in this case right from the beginning? No. We came into it after the judgment was entered. Afterwards. Yes. We generally don't do trial work.  Okay. Thank you, Your Honor. All right. Thank you. Good morning. May it please the Court. Michael Walsh for Defendant Stryker and Helmetica. I think it's important in this case to remember that the reason there are periods of limitations is to provide the parties with a reliable and predictable means of barring untimely claims. Jolly has set that standard down rather clearly. As soon as plaintiff has sufficient information that would put a reasonable person on notice of inquiry, the clock starts to run. We are in agreement that the only question before this Court is when did the clock start to run. Everything after that is math. To clarify a question Judge Berzon had before in terms of the timeframe, the record I think is undisputed that plaintiff was aware her hip replacement had malfunctioned in January of 2001. She called the implanting physician. She met with him in February 28, 2001. He examines the product with an x-ray, specifically tells her that part of the product has worn out, tells her that that product has caused additional damage to her bone, and the hip replacement has to come out. He's no longer doing surgeries. He refers her to another doctor that she sees eight days later on March 8, 2001, who again examines the product by x-ray, again tells her half of the cup is missing, that the missing cup has caused severe damage to her bone, and the replacement has to come out. She's told all of this specifically by March 8, 2001. But of course the problem is that putting her in inquiry here isn't very useful in the sense that the inquiry is the surgery, right? There's no way that she could know anything until they did the surgery definitively. That's the inquiry. What other inquiry would there be? But that's not the case. There's nothing in the record to indicate anything that was learned at the time of the surgery. The surgery was not diagnosed. The surgery was to replace the hip replacement. Well, until you did the surgery and got the piece out and looked at it, what could you know about it? Suppose she had tried to sue and not had the surgery. What could she have shown? She could have shown, well, Dr. Painter and Dr. Biama both diagnosed her condition because they could examine the product with the X-ray. They could tell half the cup was missing. They specifically told her about osteolysis, which is the particular that's causing damage to the bones. These were all things that were discussed during the initial diagnosis. There was nothing about the surgery. The surgery wasn't at all investigative. The purpose of the surgery was to make sure that there was nothing in the record. I understand that the representation was made that once they got the implement out, they were able to see that it was, I don't know what was wrong with it, but that there was something about what it was made of that was defective. There's nothing in the record indicating a single new piece of evidence or information was ascertained in the surgery. Not one. Counsel has asserted those because she needs to in order to get within the one year when the case is filed, but there's nothing in the record indicating a single new piece of information was found. Plaintiff actually concedes, and I think it's page five of the opening brief, that the clock begins to run when plaintiff learns that part of the product was missing. I think she used the word disintegrated, but I think she used it. Counsel used the term disintegrated in the brief, but doctors had before just said the piece was missing and that that had caused damage to her bone. We're in agreement that that starts the clock running, but the undisputed record shows she was specifically told that in February 28th and March 8th, 2001. There's nothing in the record indicating anything new was learned in the surgery. Now with regard to a test of when the clock runs, this court has actually already articulated a very clear test for when the clock begins to run in a price liability case in the Hopkins and the Tucker cases, which both involved implanted medical devices, as does this one. Hopkins held a more general sense that when the plaintiff learns of a potential connection between the product and the harm, that that starts the clock running. Tucker actually articulates that a little better. Kennedy. How long is that device supposed to last? Well, there's nothing in the record, actually, one way or the other. I could offer my own opinions, but there's nothing in the records that addresses that. In Tucker, though, the court clearly holds that the clock begins to run when plaintiff suspects or should suspect that her injury was the result of a malfunctioning product. And the record is clear that plaintiff knew specifically that her harm was caused by a malfunctioning product by no later than March 8th, 2001. And from that point, she has a year in which to pursue. But no one's saying that as soon as she had to leave the doctor's office and file a suit the next day. But my understanding is that her argument is she didn't know it was a malfunctioning product. She knew it was a product that had, quote, worn out and that certain things just do wear out without malfunctioning. That's the argument, as I understand it. I think you've correctly expressed the argument. What plaintiff, I think, is attempting to do with that is to resurrect a case called Kensinger, which had previously held that in order for the statute of limitations to start, plaintiff needs to know the specific facts that support her claim. Jolly specifically rejected that standard and held that all plaintiff needs is sufficient facts and circumstances to put plaintiff on notice of inquiry. A malfunctioning product certainly puts plaintiff on notice of inquiry to investigate what caused the malfunction. There's nothing in this record. But you're not answering the question. If something, I mean, if a TV stops working after 10 years, does that put you on notice to determine whether it was malfunctioning as opposed to simply wore out after 10 years? Well, I think, well, once the TV stops working, by definition, it's malfunctioning. The question then becomes why is it malfunctioning. But there's no doubt if it doesn't work, it's malfunctioning. In this case, as in January 2001, the hip replacement was popping out of her socket. She was temporarily losing control of her leg and having shooting pains. There was no doubt there was a malfunction. And then she was told by her physician that half of the cut was missing and that that missing piece had caused severe malfunction. Did the doctors tell her that before the surgery that the device was defective? The term defective doesn't appear. What they say is that the half of the cut is missing and can't be found and that that missing part had caused the malfunction. And this is something that doesn't happen. Right. And that the damage to her bone was not normal wear and tear. This was something else. But the word defective itself doesn't appear, but it doesn't need to, to start the clock running. Jolly clearly states that this is a process that's contemplated by pretrial discovery. She doesn't have to be ready for trial before the session begins. But the odd thing is, what kind of an inquiry is one supposed to do with respect to something that's inside your body other than get it out and then look at it? Well, the fact is she could have asked either one of her doctors if there was something wrong with the product. Jolly is very clear that plaintiff can't wait for the facts to come to her. She needs to look into the facts. Based on the record, it appears that the plaintiff at least went to see her doctor. She did that much. But beyond that, made no inquiry of any kind about its condition or why it malfunctioned. And as it happens, the doctors voluntarily told her enough to put her on notice. There's nothing in the record that she made any attempt to find out what was going on. And that's her duty to do so. But wouldn't this be a jury question? Who decides whether the statute, in a case like this where there's a dispute, say they're disputed facts? Well, I think jury, doesn't it? Well, typically a jury decides the facts unless the undisputed facts are sufficiently clear that there's no other reasonable conclusion. And in this case, just applying the Tucker standard, the plaintiff suspects or should suspect that her injury was caused by a malfunctioning product. It is indisputable this product was malfunctioning. The plaintiff did that before she even called her doctor. That is clear. Her doctor specifically told her part of the product is missing in your body. It's caused severe damage to your bone, which is not normal wear and tear. These facts are undisputed. They've never been challenged. And plaintiff perceives that that knowledge. Well, it could have been caught could have been the problem have been caused the pain by by, you know, the condition of her of her bones. The product is inserted. Some some people, you know, the bones are harder than other people. I'm sure that's true. And the test is not to eliminate all of the possibilities. The test is to put sufficient facts and circumstances to put a notice on inquiry. She has an additional year to determine whether to file suit. And then, as Jolvie says, the analysis that your honor is talking about in terms of the specific details of the nature of the defect is a process contemplated by pretrial discovery. That doesn't need to be completed before the statute begins to run. All she needs and Tucker's right to suspect the reason, suspect the malfunction caused. So you think it'd be a good idea if people just have some suspicion and that a defective product that's in their body is defective or there's been some malpractice that they ought to file suit. I think to to protect themselves. I think plaintiffs have an obligation once they have circumstances that lead them to that conclusion of that suspicion to investigate the matter. And the legislature has given gave plaintiff a year to make the decision whether to file suit. No one's saying she needed to run out from the doctor's office and file suit that week. The legislature gave her an entire year to make that determination. And beyond that, as Jolvie says, pretrial discovery contemplates investigating. How would she really know that there was a product was defective unless it was removed from her body? Because the doctors could see it in the x-rays. There's nothing in the evidence whatsoever. How would the doctors know from looking at the x-rays that the product was defective? They can see it just as clearly as if they removed it. The only thing you could learn by removing it, I would think, is what color it was. You can tell the condition of the product. You can tell how it's performed. You can test the product and just see what it's made of. There's no doubt additional investigation, but that's part of pretrial discovery litigation. That type of investigation isn't needed before the clock even starts running. That's the process of investigation and litigation. Well, if people did that, then you'd just, you'd have a lot of people filing malpractice lawsuits. Is that what you want? I don't think that would be the case, Your Honor. In this case, if we take the March 8th date, by March 8th, 2001, she had all the information she ever claimed she had learned. She went for the surgery in April. She had an additional 11 months to bring suit and just didn't. There was plenty of time to investigate. The plaintiff doesn't even propose to offer an excuse for why she let the clock run out. She had an abundance of time to investigate and make the decision, and she just let the clock run out. That's not totally relevant because she had a year from whatever the relevant date was. And the question is, suppose that the doctors knew everything they knew, but until they – and I don't know what the facts are, but suppose it were – that once they got the implementation out, they discovered that while it was supposed to be made out of some kind of plaster, it was made out of another kind of plaster. It wasn't just a totally – it wasn't what it was supposed to be. How could they have told them until they took it out? Well, that particular fact, perhaps you're right. They may not have been able to ascertain that particular fact. There's nothing in the evidence that that's at all the case here. But that also is a question of fleshing out the details of the case. As Jolly points out, there's a whole process of litigation, pre-trial discovery and expert discovery that's supposed to – So everything really turns here on whether there was anything discovered when they took it out that they couldn't have known beforehand. And not just anything, but something relevant. Well, something relevant to whether the product's defective. Well, but also something – no, actually, I think, Your Honor, the real question is whether she had sufficient information as of March 8th, which was her last doctor's appointment before the surgery, or the last relevant one here. Whether she had sufficient information at that time so that she should – Well, to put her on inquiry, but the question is what was the inquiry other than opening her up and having the surgery and looking at the product? But that's the process of the inquiry. The question is when does the clock start running, not what a reasonable plaintiff would spend that year doing before she files suit. The only question before the court is when does the clock start running? When does she first have notice of inquiry? After that time, she presumably conducts an investigation, finds additional information in order to make a decision about whether to file suit. But the only question here is when does the clock start? And the clock starts when she has sufficient information that she should suspect or should suspect that the malfunctioning product caused her injury. She has that information in March. Now, she's not supposed to file – she doesn't have to file suit, by the way. But that starts the clock. Then she has a year to investigate further to determine whether she really wants to file suit. And she has an additional time after that through pre-trial discovery and expert discovery to flesh out the details of what type of defect there might be and how it came about and what everything else is. But before she went into the surgery, that was, as you just said, eight days later, did the doctors tell her, I mean, don't just use that same word, that there was something wrong with this product that was defective? Did they say anything like that? They said that the product was worn out. They said that half of the cup was missing and that the missing cup had caused severe injury to her bone. Okay. The product's worn out. But they didn't say that – they didn't say, well, it shouldn't have worn out. There's something wrong with it. They did say that the injury to her bone, the resulting injury to her bone, was not wear and tear. Not what? It was not normal wear and tear. It was something different. Something that didn't happen. Something that didn't usually happen. Has there been other cases where this hip replacement, where the product was defective, the same type of product? I'm not aware of any cases where this product was found defective. I'm not aware of any cases where this product was found defective. It's easy to find out, isn't it? To be honest, I've made no attempt to look. I have not been involved in any. I haven't heard of any. Well, somewhere they keep records of all of this. At least the trial lawyers keep records. I'm sure that's true. I don't know what the answer is. All right. If the Court has no further questions. Okay. Thanks. Thank you. Any rebuttal? On the last point, I don't think the doctor said this doesn't usually happen with this type of hip implant. I don't think you'll find that in the record. He did say this degree of damage was beyond normal wear and tear to the bone. But that does not answer the question of why was this implant malfunctioning. Well, what was found out as a result of the surgery that couldn't have been found out? That wasn't found out before it. Candidly, the only thing in the record is the declaration from Plaintiff's Counsel on page 139 of the excerpts that the radiographic evidence was incomplete and without the inspection of the hip device itself, any claim of failure due to defect would have been speculative, that the device itself could not be examined by the surgeon, the patient, or attorney until it had been removed appropriately, cleaned, and preserved. And let me ---- That seems awfully vague. I mean, one can imagine circumstances in which you could explain it. What defect is being claimed here? I guess that's the ultimate question. I believe the ultimate defect that will be claimed when this case goes to trial is that the nature of the plastic liner that was being used in products at that time was a type that could crumble, little crumbs of it would come off, that that would attack the bone or cause the bone to dissolve. But the doctors knew, from what I read in the record, that these things do come off these things and do attack the bone. And they knew that before the surgery. I don't know that the doctors made that apparent to my client. If they knew, I assume they knew that. I don't know that they knew that this product was specifically subject to that because of a defect in manufacture. The surgeon who removed it was not the surgeon who implanted it, so I don't even know if he knew what type of device it was. Presumably he looked at her previous surgery. But the first person she went to did. That's correct. But let me, let me. So what does the inquiry notion mean? I mean, ordinarily, if you have a car accident and your wheel flies off, as I understand it, you don't get to wait until you have gotten somebody to examine everything about the wheel to trigger the cause of action. Once the wheel flies off, and you're supposed to say to yourself, wheel shouldn't be flying off, so I'm going to find out what happened. Well, let me answer that, and then I have three answers to the previous question, I think. The answer to that one is I think all of us, as lay people, are very familiar with the operation of cars and the millions of miles cars drive, and all of us know intuitively or because of our experience that wheels, indeed, do not fly off without something being wrong. I don't think there is any reason to think that the general public or even a person with a hip implant has any general day-to-day knowledge that the reason a hip implant would deteriorate or wear out after 10 years, because I think patients are told these things have a shelf life, they don't, they aren't permanent, I don't think there's any reason to think that the reasonable patient would know without being informed that the reason that a product would wear out after 10 years is that it was defective. So I think, I hope that answers Your Honor's last question. I wanted to go back to the what did she know after surgery that she didn't know before, and I'll pose a hypothetical. Suppose that she went to the doctor in March, she x-rayed her, and he said, the cup has fallen off, look here on the x-ray, and she filed a lawsuit the next day or at least within the next year from then, but she didn't have the surgery. Then I can't imagine the defendant defending that law. I mean, that's what's interesting. That's why this is an interesting case, because apparently the point of the one-year rule is when was she on inquiry. She can have the surgery within the next year. She did have the surgery within the next year. So the question isn't whether it's only, whether she could only know the answer, the real answer. Apparently the limitations period is triggered not when she knows it's defective, but when she is on sufficient inquiry to find out. That's the wheel spinning off. Well, let's look at the, I mean, I think otherwise we'd have a lot of people going around and either having unnecessary, possibly unnecessary surgeries, or having surgery as part of the discovery process. I find that a chilling point. That is a little peculiar. Let's look at, I want to remind the Court that we submitted a citation. Apparently we submitted it twice, by the way, to a case called Artaul v. Allen, which happened to be decided the day after we filed our last brief. And I submitted a letter last week to the Court with the official citation, which I don't remember right now, but it was decided August 13, 2003. A patient who had previously had surgery was having trouble with her throat, and she suspected, and I think she'd been told by her doctors, that the trouble was because when she was intubated as part of the surgery, her throat was irritated. And she continued having trouble with the throat, and eventually she had, I don't remember even if it was a re-surgery, but it was eventually discovered that the reason she was continuing to have the throat pain was that a bone in her throat had been cracked in the surgery. And the California Court of Appeals said, knowing that she had trouble with her throat and knowing it was due to the intubation was not enough to put her on notice that the cause was the cracked bone until she had the subsequent procedure to discover it. And I submit that that case states the rule in this case. Counsel brought up Jolly a number of times, but the reason Jolly is not good authority for this situation is that what happened in Jolly is that the patient, who was a DES daughter, started in about 1978 complaining and wondering and saying, I ought to do something about this. I ought to file a claim. I want to find out more about DES and see if there's a problem with it. She didn't file suit until 1991, and that's why the California Supreme Court said she had plenty of time to be on inquiry because she started wondering about the problem 13 years before she filed the lawsuit. The difference between Archell and this case is that in Archell, or the possible difference, is that there was something specific identified that she found out by the surgery that she couldn't have found out before the surgery. And that's what seems to me to be missing here. We don't really know what it is that she found out due to the surgery that she wasn't at least on inquiry to know before. I mean, she knew before that something happened that shouldn't have happened that was very unusual, that the cuff was not only worn through but missing. And what did she find out afterwards that she couldn't have found out before, that she wasn't at least on inquiry to find out before? Her doctor says, let's assume something that her doctor told her more than she did. Let's assume her doctor said, sometimes this happens because particles disintegrate off the device and they eat into your bone or they cause inflammation that eats into the bone. So I suppose had she sued immediately without the surgery, defendant would have been in the courtroom saying, well, we don't know if that happened in this case or not. So I suspect that when you have the device and you can clean it and you can inspect it, you can then look and say, particles wore off this device, indeed. And that's what you can discover, and that's why a counsel's declaration I think is sufficient to overcome the summary judgment here. We could not have this device examined. We couldn't determine anything until we got the device out of her body. And the policy reason that the statute of limitations cannot start to run at the time of the X-ray is the one that Judge Fragerson identified, and that is if the X-ray put her on notice in and of itself without her getting the device and inspecting it, then people would be filing medical malpractice suits based on speculation all the time because they would feel compelled to because of the way the statute of limitations operates. Now, granted, a jury may decide, indeed, that my client delayed too long to file a suit, but this is a summary judgment case, and that question of what constitutes reasonable inquiry under these circumstances is one that ought to be made by a jury and not by the district court judge. Does the Court have any further questions? Thank you, Your Honor. Thank you very much. Well argued, both sides. I would call the next matter Jenkins v. County of Riverside. Thank you.
judges: Browning, Pregerson, Berzon